Jason Weil. Jason has just completed his clerkship and is about ready to go off and save the world. And I'm very pleased with the work he's done. He made a tremendous contribution to the work of my chambers and the work of this board. I'm very proud of him, and I look forward to his appearing before us at the lectern and making the kinds of excellent arguments we're about to hear. So on that note, the formalities, I move the admission of Jason Weil, who is a member of the Bar and Good Standing of the Highest Court of Pennsylvania. I have knowledge of his credentials, and I'm satisfied that he possesses the necessary qualifications. Well, not so fast with the formalities. Let's see if there is any objection. I think he seems like a fine young man. Well, in that case, I am pleased, indeed, on behalf of the court, to grant the motion. Will you approach the clerk, please? Please raise your right hand. I swear affirmably that you will report yourself as an attorney and counsel of this court. I'll frankly, according to the law, that you will support the Constitution of the United States of America. I do. Congratulations, and welcome to the Bar of the United States Court of Appeals for the Federal Circuit. Indeed. Thank you. Congratulations, and welcome. Welcome. Proceed with the agenda for this morning. The first argued case is number 2012-1352, Cruise Technology against Volkswagen, AG, and others. Mr. Jankowski. Good morning, Your Honors, and may it please the Court. My name is David Jankowski, representing Cruise Technology Partnership. In the case below, the district court committed a sequence of three errors, each building on the last and culminating in an improper grant of summary judgment of non-infringement. Each of those errors, by themselves, warrants reversal of that judgment. The first error relates to claim construction, and in particular, the construction of the claim term, substantially isothermal process. And in that regard, this is a claim term where we actually have more information about what the judge was thinking than we sometimes do, because the judge construed the same term twice in a predecessor case versus General Motors, and then again in the case below, which is interesting. The crux of the issue here is whether the average cylinder temperature needs to remain substantially constant from the entire duration, from beginning to end, the combustion of a second fraction of fuel. Of course, the claim phrasing issue is more lengthy than just substantially isothermal process. That's correct, Your Honor. Because the phrase is, we're in the combustion, whatever the combustion means. The combustion as a result of the introduction of the second fraction, that's the second fraction of fuel, is a substantially isothermal process. So the question is, well, what does that mean? Some combustion, a little bit of combustion, all of the combustion, all combustion resulting from the introduction of the fraction. And as I understand it, the district court carefully looked at this, considered the previous claim construction to fall short, because it didn't really clarify what the extent of the combustion was, and then decided that, well, the only way to make sense out of it was to say, the combustion as a result of the introduction, et cetera, it must be the combustion that takes place during the entire combustion, from the start of the fuel injection to the end. Am I correctly characterizing the district court's position? Yes, Your Honor, I think you are. So it seems to me that there is some merit to the district court's concern that without, well, let me put it this way. It seems to me what the district court was saying is that, well, there's some ambiguity in this passage. But the district court concluded it wasn't insolubly ambiguous, because there was a construction, namely the construction that was adopted, that was consistent with at least one part of the specification, and would avoid the ambiguity. And what's wrong with that? I think that's an improper approach in the sense that I don't think there needs to be a bright line rule, which I believe is what the district court was grasping for. The district court was looking for something that would make it easy, if you will, make it somewhat black and white as to whether there is infringement or not. And I don't think that's a requirement of claim construction that all claims always have black and white boundaries to them. And in fact, this particular But isn't that what a claim is supposed to do? It's supposed to define the bounds of the property, right, so that parties would be on notice as to what they properly can or cannot do. Absolutely, Your Honor. But in this instance, if you read the patent in its entirety, it's clear that you have, of course, different embodiments, different species that are calling out, for example, isothermal combustion over the entirety of the combustion of the second fuel fraction, and that's shown in figure four of the patent. You also very clearly have an embodiment of different species, which is calling out isothermal combustion over only a portion, the second portion of the second fuel fraction. I hear you. I understand what you're saying, and I agree that the specification does disclose other embodiments where the substantially isothermal process doesn't exist over the whole range. But the problem is that you've got a claim that has this phrasing. It's, you know, I frequently give talks to interested groups, and I often remark that sometimes patentees shoot themselves in the foot because they just put language in claims that later comes back to bite them. In this case, maybe the language, maybe you shot yourself in the head because it's hard to read this language and come up with some explanation as to what it means to avoid the potential ambiguity without reading out one of those embodiments. That's what the district court did. Your Honor, what I would say is, you know, the patent is going at an idea, this idea of isothermal combustion, which is not something that was being practiced in engines. And nobody was trying to do that. Nobody was saying you should be trying to do that. And so this was very, you know, a novel approach. And, you know, you had the development of new technology for carefully controlling fuel amounts. So you could put in multiple injections. You could put in multiple injections at different times to give you different combustion profiles, which you couldn't do in the past. It wasn't done. That allowed you now to start approaching combustion profiles that really weren't very achievable, including isothermal profiles, which is what this patent was espousing. So I guess what I'm getting at is it's a situation where this patent's showing that this idea of an isothermal combustion, which nobody was doing, it can be a valuable form of a combustion process in these engines. It has benefits. It has benefits on avoiding high temperatures. It has those benefits even if you have a relatively modest amount, well, I shouldn't say modest amount, but just you don't have to have the combustion be over the entire fuel fraction to still get the benefit. That's one of the teachings, I think, of Figure 8. So are you telling us that the isothermal profile that is clear from the specification, that that applies, what, only to the third or fourth stroke of the engine? It applies during the expansion stroke, Your Honor. Only to the expansion stroke. Correct. So it's safe in the specification, but not as clearly as you've just made it. Correct, correct. You get the isothermal by carefully injecting fuel at certain rates during the expansion stroke or power stroke so that the amount of energy you're adding by combusting the new fuel that's added, you're offsetting the cooling that otherwise would be happening because as the piston moves away from top dead center, you get a cooling effect. That's going to drive temperatures down. You add more fuel in, kind of like at home, if you add more pieces of wood to your fireplace to keep the fire at a constant temperature. It's the same principle. And so you add the fuel during the expansion stroke to offset the cooling that would otherwise be going on. So what the patent is showing is you're going to get a benefit from that with a little bit of isothermal or a lot of isothermal. The other thing I'll just throw out, of course, is there is dependent claim four, which also depends from claim one, which includes the claim term we're talking about. Dependent claim four very clearly calls out the figure eight embodiment. So clearly it was in the mind of the patentee at the time the claims were being prepared that a substantially isothermal process as included in the full claim length that Judge Lin was reciting, that would include the figure eight embodiment. And I would submit that the easy answer that the district court judge was looking for is not appropriate here. This invention is designed for engines that can be different sizes. They can be big engines or small engines. They can be different types of engines. It could be diesel engines or spark ignition engines. And even for a given engine, you're going to want different fuel injection strategies, different combustion strategies at different operating speeds and loads. All the automobiles that we drive around operate in that manner. They have thousands of different points at which they operate. Obviously, when you step on the accelerator to get on the freeway, you're going to get very- You can't be telling us that just because there is a very small piece of the temperature profile that happens to be more or less level, that that means that the claim and, in fact, the description and the specification is substantially isothermal applies if any portion of that curve is flat. Or that almost has to be your position in order to prevail, doesn't it, when you look at the temperature profile? I don't think that's totally the position I would take. You do need to have an isothermal, and that's what Figure 4 and Figure 8 is showing, those of skill in the art, to look for an isothermal in an engine cycle, such as a temperature-volume plot. But you need to have enough of an isothermal to establish it as being a substantially isothermal process. So just having a fleeting amount of isothermal certainly would not meet the claim. I don't want to give the wrong impression on that. You do need to have a substantial amount of isothermal to meet the claim. Yeah, Kowski, go ahead. I'm sorry, go ahead. Just to pursue this thought, but you aren't saying that your invention covers any multiple fuel injections. No, it has to have the right temperature profile. It has to have the substantially isothermal. OK. The question I have is with respect to your motion to amend. And the district court denied your motion and found that in a motion to amend, the court has to consider whether there was diligence and whether there was prejudice to the other side. And the court specifically found that you were diligent, but also found that there was prejudice. The concern that I have is that the prejudice, and I think he was correct on both rulings, but the prejudice was the result of the fact that the Markman decision came down so late. So it was the court that created this dilemma. Isn't that something that properly should be taken into account in terms of whether the court abused its discretion in denying your motion? Absolutely, Your Honor. Absolutely. Essentially, the way this played out, Cruzi had no ability to adjust to whatever happened at the Markman. It was whatever happened at the Markman was going to be preclusive on potential summary judgment. Do you have any cases that talk about who it was, the party or the court, that caused the prejudice? I can't think of a case on that, although I do know that certainly in the Fifth Circuit, the courts tend to look more at prejudice than they do in the Northern District. Since we are under the Northern District patent rules, we were primarily looking at those cases. But there are Fifth Circuit cases that say you look carefully at the prejudice to the movement as well. And this is an issue where the prejudice to Cruzi is enormous, because it's essentially removing litigation on the merits. Shall we save the rest of your time for rebuttal? Yes, please. If you need to tell us. Thank you. OK. Mr. Sweeney? If I may, I'd like to speak to the court. First of all, with respect to the claim construction. Mr. Sweeney, I'd like you to swing back to the prejudice since we just heard it. Yes. How would, given that Cruz was diligent in seeking his amendments, and considering there was some time left  was BW a prejudice, and how is BW a prejudice? Well, first of all, when the main plus the post injections were accused, the main injection did start at top dead center, substantially at the beginning of the expansion stroke. In fact, we admitted that we complied with that claim element. We did not know that the post would be accused. And the post begins a lot later than top dead center. So the substantially at the beginning of top dead center would have afforded us a defense that we really didn't have time to pursue. Secondly, this phrase, as a result though in the claim, that the isothermality is a result of the second fraction of combustion itself, that doesn't necessarily apply to the post. The post, we believe, there would be evidence to show that any isothermality there would be caused by the previous main injection. So that's another claim term. There were two claim terms that the judge was not asked to consider, because they were not implicated by the contentions. So we think we were prejudiced there. But the fact that the district court would have to make these additional claim constructions was a result of the fact that the Markman determination was delivered at that fairly late point in the litigation. So even if you're right that there was prejudice, because now the district court has to make more claim construction, then you have to take more discovery to address those claim constructions and all of that. That was not Cruz's doing, was it? Yes, it was, Your Honor. And it's a good point, and I'd like to address it. We exchanged claim terms. The Markman hearing was in the end of September. We exchanged proposed claim constructions in around July, substantially before the Markman hearing. They knew our claim construction at that time. And they knew all about the post-injection characteristics. They had graphed it. But when we asked them what their contention was, they insisted on including the main. Now, that was a strategic choice that they made. And if we look at the St. Clair case in Delaware, the strategic choice that a plaintiff makes there with respect to not divulging its alternative theory is not good cause under the LOGO rules. And the same, it was true in the case recently decided by this court that both of them were involved in it, the Parallel Networks case. We submitted a supplemental citation on it. The idea that you cannot sit on an alternative strategy and assume that you're going to win on your claim construction and keep the other one under wraps and not unveil it until you lose. Otherwise, it would be an in. What if they lose the next Markman hearing? And then we have another contention. There was one Markman hearing. Everybody knew it. They had an alternative infringement theory that they kept hidden. And they didn't unveil it until the last minute. So that's a strategy. And that strategy cannot establish good cause under the LOGO rules. And that, I think, is the spot. You're sure of that? You're sure that they had an alternative that they kept hidden as opposed to coming up with it when they were more or less blindsided by that construction? I am confident that he did because the original contentions showed the same exact graph, the same isothermal region extending from the main into the post. They didn't accuse the post because they didn't think they could comply with this substantially at the beginning of the expansion stroke requirement. Yes. So I think good cause, it was their burden in the district court to show good cause for the amendment. And they didn't comply with the good cause under the holding of this court in the Parallel Networks  Flair case, which are very, very similar on the facts. I'd like to turn back just to the claims instructions for a moment. The claim says that the combustion is a substantially isothermal process. It doesn't say a portion of the combustion or part of the combustion. So the plain meaning is that means the entire combustion. That's the same conclusion that this court reached in the Intamin case, where we're talking about the conductive rail extending the length of the fixed portion, the roller coaster fixed portion, the frame. The length meant the entire length, not some portion of it. But isn't it impossible thermodynamically to be isothermal over the entire combustion? In any case, when you look at the specification, there has to be an enlargement, a period of stability, and then diminution. Yes, I don't deny that, Your Honor. And it says substantially isothermal. But in our case, with this main injection, at the beginning of the main combustion, there's an increase of some 800 degrees in temperature. Certainly, the isothermality requirement can embrace something like that. We're not saying it has to be 100% from beginning to end of the combustion, maybe 95% or 90% or 80%. But we're down in the 23% area or the 48% area. We're way, way away from anything approaching the entire combustion. There's certainly a little give. It doesn't have to be from absolute end to end. It can have rounded corners. We don't deny that at all, Your Honor. But I want to mention one other case, the hamonics case we cited in our brief, when they talked about the centrifugal unit having two components, the centrifugal component and a tube component. And the centrifugal unit meant the entire centrifugal unit, not some portion of it. And the court even wanted to say, well, you know, that really doesn't make any sense, because there was, I think, a radius limitation that would have made the whole unit smaller than the component. And the court said, well, that's the way this claim was written. And they wrote the claim, the claim that they asserted in the way that they did. There are other claims that don't have that limitation in that way, that were not asserted for one reason or the other. So I think the claim meeting controls. It is consistent with figure 4 of the patent, which shows the isothermality from end to end, from beginning to end. It's consistent with the deposition testimony of Mr. Cruz, who said he understood the substantial isothermality going from throughout the combustion. So I think the claim construction is solid and it follows exactly the analysis that this court has made in previous cases, like the Intamin case and the hamonics case. On the equivalent issue, this is not a binary situation. If we were 90% of the whole combustion, that would be a different story. But we're not even close. There's obviously a very, very substantial difference between the accused combustion processes and the requirement of the claim. But moreover, for the doctrine of equivalence, you have to show the same function, way, and result, not as some prior art product. But you have to compare the accused equivalent to something that is literally within the claims. As Judge Selden noted, there was no effort to do this. And there was no evidence of any equivalence with respect to power, or efficiency, or emissions. There was testing done of the engines that showed the internal conditions, but none that showed any effect on emissions. So I clearly think there's no equivalence. I think the judge was correct in not permitting the motion to amend, as mentioned. We would have been prejudiced in a most important term. We would have been denied the opportunity of construction of two claims that would have provided defenses, as well as discovery. And Cruz certainly saw this coming. They had the information that was the basis of the contention.  And I think they were, Cruz's counsel, was well aware of the Intiman case, having argued for the same position that I'm arguing right now, contemporaneously with his previous General Motors case. So it was not so much of a surprise. Thank you. Thank you, Mr. Sweeney. Mr. Jankowski. Thank you, Your Honors. First point I want to make clear is there was no hidden strategy. We were following, in our original contention, only the approach that we were expecting based on the court claim construction of the GM case. We were expecting that. We've been consistently following that approach in several litigations. And we didn't have a backup and didn't develop one until we needed to because of the markman, which did come out of left field for us. But the claim construction was in play, even though the district court found that you were diligent and didn't necessarily have to anticipate that you would lose the argument on claims construction. Nonetheless, the claim construction was in play. Didn't that place some sort of an obligation on you to at least indicate some sort of contingent contentions that, well, OK, if the claim goes this way, here's our contention on infringement. If the claim construction goes that way, here's our infringement contention. In fact, Your Honor, the defendants put forth five different proposals on that claim term when we exchanged our disclosures under the Northern District Patent local rule. And they didn't come down to their final one, or actually two, alternatives until their markman brief, which was much closer before the markman. And by this point, we would have had to amend, we would have had to file a motion for leave to amend our contingents at that point, which they probably would have opposed, because they opposed it. But there were lots of amendments. So there were amendments made along the way, right? There really weren't. Those were proposed amendments that they were not agreeing to, or they were not agreeing that they were sufficient. But we were making amendments at their request. They did not request that particular amendment. On the claim construction issue, as to the prejudice to VW, we never said that we would not oppose, we never said we would oppose a motion for additional claim construction. The issue never came up. So that prejudice is something, the court could have construed the claims, for example, on summary judgment itself. And then finally, on doctrine of equivalence, I just want to point out the court's two recent cases. You have the Deere and Company case from, just decided in December, cautioning district courts not to take a shortcut approach to the doctrine of equivalence. That was reiterated just last month in the Brilliant Instruments case. Those cases are directly on point, particularly Brilliant, where the person with skill in the art provided testimony on function way result that was disregarded by the court. We believe that happened here as well. Thank you, Your Honor. OK. Thank you, Mr. Jankowski and Mrs. Sweeney. The case is taken up as submission.